**In re JAKE'S ON THE PIKE, Debtor.**

**Ramona K. MIDDEL, Plaintiff,**

**v.**

**JAKE'S ON THE PIKE, Defendant.**

**In re Jacob Reinder MIDDEL, Debtor.**

**Ramona K. MIDDEL, Plaintiff,**

**v.**

**Jacob Reinder MIDDEL, Defendant.**

**Bankruptcy Nos. 85–01800–A, 85–01801–A.**

**Adv. Nos. 85–0529–A, 85–0530–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Oct. 14, 1987.

Bennett Young, McGuire, Woods, Battle & Boothe, McLean, Va., for debtors.

Donald Cheatham, Washington, D.C., for plaintiff.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

In this case we are called upon to determine the dischargeability of a debt pursuant to section 523(a)(5) of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 101–151326 ("the Code"). On the debtors' motion, the above-styled adversaries were consolidated for trial. After the trial was commenced, the proceedings were prematurely terminated by a bomb threat directed toward an adjacent floor of the building. The trial was continued to a later date when the matter was concluded and taken under advisement.

The debtor-defendants in these two adversary proceedings are Jake's on the Pike ("Jake's"), a Maryland partnership operating a restaurant by the same name, and Jacob R. Middel ("Mr. Middel"), the principal general partner of Jake's. The plaintiff, Ramona K. Middel ("Ms. Middel"), is Mr. Middel's ex-wife. Ms. Middel asserts that an executory "Employment Contract" ("Employment Contract") by herself and Jake's on the Pike and guaranteed by Jacob R. Middel personally, was intended as a means to satisfy a debt owed to her by Mr. Middel for alimony, support, or mainte-nance within the meaning of section 523(a)(5) of the Code.

By the terms of the section, the exceptions to discharge found in section 523 apply only to individual debtors and not to partnerships or other non-individuals. Consequently, the Court treated the nondischargeability proceeding against Jake's as a motion to require the debtor to accept or reject an executory contract. *See* 11 U.S.C. § 365(d)(2). Jake's in fact had filed a motion to reject the Employment Contract prior to trial; the Court effectively granted Jake's motion by suggesting that counsel present an order for the Court's entry authorizing the rejection of the contract.[1] Remaining for the Court's consideration was Ms. Middel's section 523(a)(5) complaint against Mr. Middel individually.

Mr. Middel and the plaintiff were married in November 1978. In November 1982 the couple separated and Ms. Middel filed a divorce action in the Superior Court of the District of Columbia. The lengthy divorce proceedings that ensued were complicated by Ms. Middel's filing of a chapter 7 petition for relief in the District of Columbia Bankruptcy Court on June 15, 1984, just before the divorce trial was scheduled to begin on June 19, 1984. On May 9, 1985 the Middels executed a "Separation and Property Settlement Agreement" ("Property Settlement Agreement" or "Agreement") settling the claims at issue in the divorce action. This Property Settlement Agreement was approved and ratified by the Superior Court.

The provision of the Property Settlement Agreement relevant to the instant action obligates Mr. Middel to cause one or more of his business enterprises to enter into a three-year contract with Ms. Middel "for future services on an independent contrac-

---

1. Damages resulting from the rejection of an employment contract are governed by section 502 of the Code. Under section 502, an ex-employee's claim for damages may not exceed:

  (A) the compensation provided by such contract, without acceleration, for one year following the earlier of—

    (i) the date of the filing of the petition; or

    (ii) the date on which the employer directed the employee to terminate, or such employ-ee terminated, performance under such contract; plus

  (B) any unpaid compensation due under such contract, without acceleration, on the earlier of such dates[.]

11 U.S.C. § 502(b)(7). Recovery of damages is, of course, subject to the usual procedure of filing a proof of claim and resolving any objections thereto.

tor basis." Remuneration is to be $2,500.00 per month in the first year and $2,000.00 per month in the remaining two years. In return for the above-described consideration, during the term of the contract Ms. Middel is to provide three "renderings" of an exterior and of an interior of a restaurant. The renderings are to be made from photographs provided by Mr. Middel. According to the Agreement, the Employment Contract is not to be cancellable, and Ms. Middel "shall be entitled to the consideration in said Agreement so long as she remains alive and available to provide the services."

Pursuant to the Property Settlement Agreement, Mr. Middel caused Jake's to enter into the Employment Contract with Ms. Middel on May 10, 1985. The terms of the Employment Contract are consistent with the relevant terms of the Agreement. On May 10, 1985 Jake's also executed a "Security Agreement (Chattel Mortgage)" ("Security Agreement") to provide Ms. Middel collateral for the payments due her under the Employment Contract. The Security Agreement granted Ms. Middel a security interest in Jake's personal property (pizza ovens and other restaurant equipment). Among other things, the Security Agreement includes a list of events constituting default and provides for remedies in case of default.

■ Whether the Employment Contract between Jake's and Ms. Middel represents a nondischargeable debt for alimony, maintenance, or support rather than a dischargeable property settlement debt depends on the intent of the Middels when they entered into the Property Settlement Agreement settling their divorce litigation. *Tilley v. Jessee,* 789 F.2d 1074 (4th Cir. 1986); *Melichar v. Ost,* 661 F.2d 300, 303 (4th Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982). Dischargeability is a matter of federal law, not state law. *In re Williams,* 703 F.2d 1055, 1056 (8th Cir.1983); *but see Caswell v. Lang,* 757 F.2d 608, 610–11 (4th Cir.1985) (child support arrearages may not be included in a chapter 13 wage-earner plan because state court determinations of ali-

mony and child support obligations should not be disturbed by federal bankruptcy courts). The burden of establishing nondischargeability is on the plaintiff. *Tilley v. Jessee, supra,* at 1077.

We deal with one of the plaintiff's contentions preliminarily. Much of the testimony elicited by the plaintiff in her case-in-chief was offered to show that Mr. Middel came into the Bankruptcy Court with "unclean hands" and was thus ineligible for equitable relief in the form of a discharge of the debt at issue. The Bankruptcy Court is unquestionably a court of equity. The familiar maxim that "he who comes into equity must come with clean hands" means that a litigant cannot call upon a court of equity to grant him extraordinary relief if he himself has been guilty of of inequitable or unconscionable conduct. *See Manufacturers' Finance Co. v. McKey,* 294 U.S. 442, 448–52, 55 S.Ct. 444, 447–49, 79 L.Ed. 982 (1935). The "unclean hands" doctrine has been applied to deny petitioning creditors relief in the Bankruptcy Courts. *See, e.g., In re Quality Trading Co., Inc.,* 36 B.R. 265, 269 (Bankr.D. Hawaii 1984) (involuntary bankruptcy petition dismissed under section 303(b) of the Code because two of the four creditors filed in bad faith). It has been applied by this Court to preclude granting a debtor-defendant equitable relief from the enforcement of a forfeiture-of-renewal-commissions clause in the debtor's insurance agency contract with his former principal. *Matter of Murphy,* 9 B.R. 167, 178–81 (Bankr.E. D.Va.1981). However, the instant case is not one to which the doctrine applies. The plaintiff has offered no credible evidence to show that Mr. Middel acted inequitably or unconscionably with respect to the matters now in issue. Mr. Middel admitted to lying in a deposition in order to protect his current wife from a criminal charge, but this incident has no bearing on the dischargeability of his debt to the former Mrs. Middel. Similarly, Mr. Middel's allegedly false financial statement proffered in evidence by the plaintiff has nothing to do with whether the debt Mr. Middel owes represents a property settlement or whether it is

in the nature of alimony, support, or maintenance.

Exceptions to a debtor's discharge in bankruptcy "must be limited to those clearly enunciated" by Congress. *Matter of Murphy, supra,* 9 B.R. at 181 (considering section 17(a) of the Bankruptcy Act of 1898) (*See Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915). No support for the plaintiff's "unclean hands" argument is found among the statutory exceptions enumerated in section 523. Consequently, the plaintiff's assertion of fact concerning the defendant's "unclean hands" is not relevant to the issue at hand.

To show that the Employment Contract was intended to be a debt for alimony and support, the plaintiff offered *inter alia* the testimony of the attorneys who prepared and negotiated the Property Settlement Agreement; true copies of the Property Settlement Agreement, Employment Contract, and Security Agreement; and the testimony of Ms. Middel. The first witness, Mark B. Sandground, Esquire ("Sandground") had represented Ms. Middel in her divorce action against Mr. Middel. Sandground testified that Ms. Middel sought alimony and support, an equitable division of marital property, and counsel fees in her divorce action. According to Sandground, the Employment Contract was a method devised for the payment of alimony and support. Anticipating a claim by Ms. Middel's Trustee in Bankruptcy, Stanley M. Salus, Esquire ("Salus"), to a portion of the proceeds of the Property Settlement Agreement and Employment Contract as a division of marital property that would be property of the estate under section 541(a)(5)(B) of the Code, Sandground caused a copy of the Agreement to be submitted to Salus for his approval. Salus ultimately agreed to settle his claim to a portion of the settlement proceeds as non-exempt assets for the sum of $5,000.00.

When asked to inspect a copy of the Property Settlement Agreement, Sandground was able to identify the following proviso written in his own hand in the margin of page 7: "N.B. The provisions of paragraph 11 as aforesaid are in lieu of any provision for alimony."[2] On cross-examination, Sandground agreed that the idea for the handwritten language came from the attorney on the other side of the negotiating table, Thomas C. Green, Esquire. Sandground also conceded that he was still acting as Ms. Middel's attorney in certain matters and was still being remunerated by her.

Jane Lipton-Rubenstein, an attorney associated with Sandground's law offices during the time of the Middel divorce-settlement negotiations, testified briefly concerning her role in that matter. Ms. Lipton-Rubenstein stated that she communicated with Salus, the bankruptcy trustee, regarding his claim to the proceeds of any settlement received by Ms. Middel as part of the divorce action, thus helping to forge the settlement with him that facilitated the settlement between Mr. and Ms. Middel. Ms. Lipton-Rubenstein also testified that she saw no inconsistency in characterizing the Employment Contract payments as future earnings with respect to Ms. Middel's bankruptcy proceedings but as alimony with respect to Mr. Middel's bankruptcy; in the District of Columbia, she stated, future earnings are considered to be alimony.

Also called as a witness by the plaintiff was Thomas C. Green, Esquire ("Green"), who represented Mr. Middel's interests during the divorce settlement proceedings. Green's testimony regarding what Ms. Middel sought in the negotiations corroborated Sandground's testimony: Ms. Middel wanted alimony, an equitable division of marital property, and attorneys' fees. Green stated that no allocation of the settlement among the three areas was ever attempted;

---

**2.** Paragraph 11 reads in full:
 Except as otherwise provided herein, each party is hereby fully released by the other party from any obligation for alimony, support and maintenance. Each accepts the provisions herein in full satisfaction of all obligations for support or otherwise arising out of the marital relationship of the parties and each relinquishes any rights or claims to the earnings, accumulations, money or property of the other.

on cross-examination, he characterized the Property Settlement Agreement as a "global settlement" of all issues presented by both parties. Green could not recall the reason for the handwritten language "in lieu of alimony" that Sandground testified was included in the Property Settlement Agreement at Green's insistence. However, Green did testify that Ms. Middel's acceptance of the Property Settlement Agreement was conditioned on her bankruptcy trustee's acceptance.

Ms. Middel testified that she consistently sought an award of alimony throughout the protracted divorce proceedings. She sought and obtained an award of *pendente lite* support in the amount of $1,000.00 per month. *See* Plaintiff's Exhibit 6. In her action for divorce, Ms. Middel sought permanent spousal support. Ms. Middel stated that she approved of the Employment Contract suggested by Mr. Middel during the divorce settlement negotiations because she saw the contract as a form of "collateral" for alimony. She claimed that Mr. Middel had failed to make timely payments of the *pendente lite* support ordered by the District of Columbia Superior Court; she saw the future-services contract with Jake's as a guarantee that Jake's would pay her regularly regardless of any desire Mr. Middel might have to withhold support. Ms. Middel asserted that alimony was her "most important consideration" during settlement negotiations, but acknowledged that she knew that part of the funds she was to receive pursuant to the Property Settlement Agreement would become property of her bankruptcy estate.

On cross-examination, Ms. Middel was asked whether she ever sought or authorized a lump-sum settlement offer during the divorce-settlement negotiations. Without directly answering the question, Ms. Middel stated that "all I ever wanted ... [was the] right at least to start up again." [3] Questioned further about her alleged desire for a lump-sum award, Ms. Middel stated: "I would have liked to have received what was rightfully mine, and I would have liked to have not had to go to court every month [to force Mr. Middel to make support payments]." Jake's made four monthly payments of $2,500.00 and thus was current under the Employment Contract when Jake's filed its chapter 11 petition.

Witnesses for the defendant included Stanley M. Salus and Mr. Middel. As set forth above, Salus served as Ms. Middel's chapter 7 trustee. Salus identified Ms. Middel's bankruptcy Schedule B–2, which listed among her assets a claim to 50% of all marital property acquired during coverture and a claim to equitable spousal support from Mr. Middel. Salus testified that he took the position that any realization of these claims would be property of Ms. Middel's bankruptcy estate.[4] With respect to the Property Settlement Agreement between the Middels, Salus maintained that part of what Ms. Middel was to receive was consideration for nonexempt assets. Salus presumed from a reading of the Agreement that Ms. Middel's position would be that the Employment Contract represented future services not subject to administration by the Bankruptcy Court. Salus compromised his claim for $5,000.00; in the notice of the compromise sent to creditors, Salus stated his presumption regarding Ms. Middel's position vis-a-vis the Employment Contract payments.[5] At the time, Ms. Mid-

---

3. It is not entirely clear what Ms. Middel meant by "start up again," although from 1980–82 she and Mr. Middel operated a women's clothing store in the Georgetown section of the District of Columbia. Ms. Middel testified that she ended her association with the store because Mr. Middel would not provide financing adequate to make the store successful.

4. Salus sought and obtained an order from the District of Columbia Bankruptcy Court tolling section 541(a)(5)(B)'s 180–day limit on the inclusion of spousal property settlement agree-

ments in the bankruptcy estate. Because the United States District Court for the District of Columbia did not consider the order a final appealable order, Ms. Middel's appeal was unsuccessful.

5. The notice to creditors reads in relevant part:
NOTICE OF SETTLEMENT WITH DEBTOR
PLEASE TAKE NOTICE that Stanley M. Salus, Trustee, has agreed to a settlement with the Debtor, Ramona K. Middell [sic], whereby she will pay the Trustee the sum of Five Thousand Dollars, ($5,000.00) at the rate of Five Hundred

del apparently did not dispute Salus' characterization of her position. Nowhere on her schedules did Ms. Middel claim an exemption for support payments or alimony, Salus testified.

Mr. Middel disputed his former wife's charge that he willfully withheld her court-ordered support payments. He testified that he made all the *pendente lite* payments that were required except for the three monthly installments that had been attached by her creditors prior to her bankruptcy. Mr. Middel also disputed Ms. Middel's contention that the Employment Contract was intended solely as a source of income substituting for alimony. Mr. Middel stated that he viewed the Property Settlement Agreement and Employment Contract as a "buy out" of Ms. Middel's claim to 50% of all of his assets. Concluding his direct testimony, Mr. Middel declared that he had no intention to file bankruptcy when he executed the Property Settlement Agreement and Employment Contract in May 1985: he explained that his and Jake's chapter 11 petitions filed on October 1, 1985 were necessitated by pressing business problems, not by a spiteful or malicious desire to shed his obligations to his former wife.

In closing argument, counsel for Ms. Middel stressed that Ms. Middel had sought and obtained an award of *pendente lite* support and that she had doggedly sought alimony in her divorce action. Counsel claimed that only $5,000.00 of the funds Ms. Middel was to receive pursuant to the Property Settlement Agreement was attributable to a property settlement; otherwise, argued counsel, Ms. Middel's Trustee in Bankruptcy would have demanded more than $5,000.00 in return for his agreement

not to lay claim to the property settlement funds. According to counsel, Ms. Middel did not claim an exemption for alimony in her bankruptcy schedules because at the time her petition was prepared she had no vested rights to alimony aside from her *pendente lite* payments, which had been attached. Counsel argued that Ms. Middel needed support, claiming that Ms. Middel had testified that she was currently unemployed and could not be employed because of her immigration status; however, an inspection of the trial transcript reveals no such testimony from Ms. Middel. Furthermore, counsel claimed that the handwritten language "in lieu of alimony" was included in the Property Settlement Agreement at Ms. Middel's insistence, whereas in fact Ms. Middel's own divorce attorney, Mark B. Sandground, testified that the clause had been included at Mr. Middel's attorney's insistence.

Counsel for Mr. Middel conceded that Ms. Middel had actively sought support throughout the divorce proceedings and conceded that the idea for an employment contract between Jake's and Ms. Middel was Mr. Middel's. However, counsel noted that Ms. Middel quickly embraced the idea, arguing that she endorsed the contract not because she wanted or needed alimony but because it would solve her problems with her bankruptcy trustee. Counsel implied that Ms. Middel would have preferred a lump-sum settlement—an implication the truth of which she did not deny on cross-examination—but for the fact that a lump sum would have become property of her bankruptcy estate. Future earnings are not included in the estate under section 541 of the Code; in contrast, alimony is includ-

---

Dollars ($500.00) per month, for her non-exempt assets to be received pursuant to a Separation and Property Settlement Agreement (the "Agreement") between the debtor and her former husband Jacob Middel.

The Debtor has scheduled numerous claims against her former husband, all of which are resolved by the Agreement with him. The Agreement essentially provides for payments to the Debtor, through a consulting contract, of Two Thousand Five Hundred Dollars ($2,500.00) per month for the first year, Two Thousand Dollars ($2,000.00) per month for the

second year and Two Thousand Dollars ($2,000.00) per month for the third year. Under the Agreement the Debtor relinquishes her right to certain marital property, which she scheduled in this proceeding, which marital property may not have been exempt. The Debtor claims the payments are future earnings, and therefore, do not belong to this Estate. The Trustee claims the payments are consideration for the non-exempt marital property. To settle the Trustee's claim the Debtor has agreed to pay Five Thousand Dollars ($5,000.00) to the Trustee.

ed to the extent it is not actually needed for support.

Defense counsel claimed that Ms. Middel's characterization of the Employment Contract debt changes depending on what the most advantageous position happens to be: with the bankruptcy trustee, she tacitly claimed it to be future earnings; in her divorce decree, she referred to it as a property settlement; and in this Court she insists that it represents nondischargeable alimony—yet she has offered no evidence of her current employment, income, or need for support. According to defense counsel, other factors tending to show that the parties did not intend the debt to represent alimony include the relatively brief three-year payout period under the Employment Contract rather than an indefinite period based on need; the lack of contract provisions to allow adjustment of the monthly payments in case of changed circumstances such as remarriage or increase in income; the short (four-year) duration of the marriage prior to separation; the absence of children of the marriage; and Ms. Middel's youth, high level of education, and proven work skills and experience. In addition, counsel argued, the Employment Contract was secured by a Security Agreement, which counsel asserted to be more indicative of a sale of property than an alimony agreement.

■ Whether Mr. and Ms. Middel mutually intended the Property Settlement Agreement and Employment Contract to represent a debt for alimony, a debt in settlement of property claims, or a debt having hybrid characteristics is an issue that must be determined here with reference to factors identified by the courts. *E.g., In re Coffman*, 52 B.R. 667, 674–75 (Bankr.D.Md.1985) (identifying eighteen factors); *In re Nelson*, 16 B.R. 658, 660–661 (Bankr.M.D.Tenn.1981) (identifying eleven factors), *rev'd in part on other grounds*, 20 B.R. 1008 (1982).

We first turn to the document itself. The Property Settlement Agreement supports the notion that the parties intended a "global settlement." One of the introductory paragraphs recites that "this Agree-ment settl[es] all property and support rights existing between [the parties], present and future." Furthermore, paragraph 11 provides that each party releases the other from "any obligation for alimony, support and maintenance" and that each party also accepts the provisions of the Property Settlement Agreement "in full satisfaction of all obligations for support or otherwise arising out of the marital relationship of the parties and each relinquishes any rights or claims to the earnings, accumulations, money or property of the other." Thus the document itself reveals a two-fold purpose: to mutually release all claims for alimony, support, and maintenance and all claims to property. Evidence showed that the handwritten proviso to paragraph 11 (paragraph 11 is "in lieu of any provisions for alimony") was suggested by Mr. Middel for reasons unknown; it does not shed much light, if any, on the issue of intent. The fact that the document is entitled "Separation and *Property Settlement Agreement*" (emphasis added) is not dispositive proof of what the parties intended. *Matter of Smith*, 3 B.R. 224, 230 (Bankr.E.D.Va.1980).

In addition to the monthly Employment Contract payments now at issue, Mr. Middel assumed several other financial obligations listed in the Property Settlement Agreement:

—payment of $10,000.00 to Ms. Middel's designated creditors (paragraph 3)

—payment of $5,000.00 to Resurrection Church in Toronto, Canada (paragraph 3)

—payment of $3,575.00 to Ms. Middel for "moving expenses" (paragraph 4)

—guarantee of a condominium or apartment lease for Ms. Middel's benefit for a two-year period, an obligation not to exceed $2,000.00 per month (paragraph 5)

—payment of $12,675.00 to Mark B. Sandground, Esquire for Ms. Middel's legal fees (paragraph 7)

The document provided that Mr. Middel would be allowed to offset certain of the above payments against the monthly payments due under the Employment Con-

tract: the $5,000.00 to Resurrection Church, the $3,575.00 for moving expenses, and any amounts actually paid pursuant to the two-year rental guarantee. However, no reason is given for this right of offset.

No reference at trial was made to any of Mr. Middel's financial responsibilities except those under the Employment Contract. No attempt was made in the Property Settlement Agreement to categorize any of the payments as "support" or in the nature of a "property settlement." The placement of the various payment paragraphs within the document does not suggest any relevant inferences. Accordingly, it would be speculative to attempt to draw conclusions about the Employment Contract debt incurred pursuant to paragraph 3 of the document based on the document's other payment provisions.

The document in this case does not resemble the one considered by the Fourth Circuit in *Tilley v. Jessee, supra,* which clearly labeled payments as alimony or property and dealt with them in separate numbered paragraphs. At trial, the plaintiff sought to show that the paragraph purporting to settle property claims was actually in the nature of alimony or support. *Tilley v. Jessee, supra,* at 1076–1077. When the language of the operative agreement is unequivocal, however, it erects "a substantial obstacle" that the plaintiff must overcome with evidence that the parties intended otherwise. *Id.* at 1078. In *Tilley,* the plaintiff's testimony as to her own intent to obtain support was not sufficient to demonstrate the mutual intent of both parties in the face of Mr. Tilley's testimony that his desire had been to regain control of jointly-held property. *Id.*

While the Property Settlement Agreement does not raise "a substantial obstacle" before Ms. Middel, neither does it appear to assist her in carrying her burden of proof on the issue of nondischargeability of the Employment Contract debt. The Agreement makes it clear that Ms. Middel relinquished her claims to alimony, support, or maintenance as partial consideration for the payments she was to receive, but the Agreement itself contains no indication of the value of those claims.

Further, in the course of its decision in *Tilley* to reverse the lower court's determination that certain payments represented alimony, the Fourth Circuit stressed that the payments were "in direct contrast to the usual operation of marital support payments" because they "would continue despite the remarriage of the wife or death of the husband." *Tilley v. Jessee, supra,* at 1078 n. 3. The case at bar presents a similar circumstance, for under paragraph 3 of the Property Settlement Agreement, Ms. Middel is entitled to monthly payments "so long as she remains alive and available to provide the services." No other contingencies are mentioned in the document. Thus, the parties' arrangement on its face bears a marked dissimilarity to an alimony to support obligation.

Consideration of the remaining factors outlined by the *Coffman* and *Nelson* courts sheds little light on the issue before us, for the evidence bearing upon any single factor is insufficient to support a conclusion regarding the character of this Employment Contract.

The only indication of Ms. Middel's need for support is the statement of her counsel that Ms. Middel was not employed at the time of her divorce and could not be employed because of her "immigration status". No evidence was offered in support of this assertion. Without more, we cannot conclude that both parties intended the Employment Contract as support for Ms. Middel.

After considering the testimony and documentary evidence presented at trial under the guidelines developed by the case law, the Court must conclude that the plaintiff in this case, Ms. Middel, has failed to carry her burden of proving that Mr. Middel's personal obligation to guarantee the Employment Contract is a nondischargeable debt within the meaning of section 523(a)(5) of the Code. As the Fourth Circuit recently re-emphasized, the overriding issue in a case such as this is the mutual intent of the parties. *Tilley v. Jessee, supra,* at 1078. Thus, it is Ms. Middel's burden to show

that she and Mr. Middel mutually intended all or a part of the Employment Contract obligation to be in the nature of alimony, support, or maintenance. This she has failed to do.

Having ruled in favor of the debtor on the dischargeability issue, the Court need not consider the plaintiff's motion for relief from stay to pursue state-law collection remedies against property of the estate.

An appropriate Order will enter.