**In the Matter of James A. WISEMAN, Debtor.**

**Heidi Wiseman, Plaintiff,**

**v.**

**James A. Wiseman, Defendant.**

**Bankruptcy No. 04–33692 HCD.
Adversary No. 04–3125.**

United States Bankruptcy Court, N.D. Indiana, South Bend Division.

Sept. 29, 2006.

Jeffery A. Johnson, Esq., May Oberfell Lorber, Mishawaka, IN, for plaintiff.

R. William Jonas, Jr., Esq., Hammerschmidt, Amaral & Jonas, South Bend, IN, for defendant.

## MEMORANDUM OF DECISION

HARRY C. DEES, JR., Chief Judge.

Before the court is the complaint of the plaintiff Heidi Wiseman ("plaintiff" or "Heidi"), filed on October 4, 2004, against her former spouse, chapter 7 debtor James A. Wiseman ("defendant" or "James").[1]

---

**1.** The initial filing was entitled "Petition for    Objection to Discharge of Claim of Marital

After a change of counsel, numerous continuances, and attempts at mediation, a trial on the complaint was held on May 30, 2006. The parties filed proposed findings of fact and conclusions of law, and the court then took the matter under advisement. For the reasons that follow, the court finds that the debtor's obligation to the plaintiff is excepted from discharge pursuant to 11 U.S.C. § 523(a)(15) and grants the plaintiff's complaint.

### Jurisdiction

Pursuant to 28 U.S.C. § 157(a) and Northern District of Indiana Local Rule 200. 1, the United States District Court for the Northern District of Indiana has referred this case to this court for hearing and determination. After reviewing the record, the court determines that the matter before it is a core proceeding within the meaning of § 157(b)(2)(I) over which the court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and 1334. This entry shall serve as findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52, made applicable in this proceeding by Federal Rules of Bankruptcy Procedure 7052 and 9014. Any conclusion of law more properly classified as a factual finding shall be deemed a fact, and any finding of fact more properly classified as a legal conclusion shall be deemed a conclusion of law.

### Background [2]

James and Heidi Wiseman were married on January 10, 1976. During the marriage, Heidi remained at home raising their children, and James started a business, MidWest CATV Engineering, Inc. ("CATV"), which repaired electronics and cable equipment. Between 1977 and 1997,

the company expanded; eventually, it included the repairs of analog equipment, cellular equipment, and first generation cellular phones.

On June 21, 2000, the 24–year marriage of James and Heidi was dissolved by a Decree of Dissolution issued by the St. Joseph Circuit Court. See Pl.Ex. 4. At the time of the divorce, James's divorce lawyer presented to Heidi's divorce lawyer an accounting of the parties' assets and liabilities. See Pl.Ex. 1. Using documents provided by James, he listed four pieces of real estate: the marital home and business real estate in Mishawaka, Indiana; lake property in Dowagiac, Michigan, and property in Cape Coral, Florida. The other assets included James's business, CATV, which was valued at $953,772.45, leased vehicles, household goods, and two 401(k) plans. Together, the marital assets were valued at $2,283,772.00. The parties' debts, in the form of mortgages, business loans, and a Visa bill of $11,000, totaled $1,123,000. According to James's attorney, because the net assets of the Wisemans totaled $1,160,772, "[t]his equates to $580,386 to each party." Id.

In the divorce decree, the court approved the parties' Property Settlement Agreement ("Settlement Agreement"), which divided the assets and debts of the parties. See id.; Pl.Ex. 2. In the Settlement Agreement, James retained the family home in Mishawaka, the second home in Florida, and commercial real estate in Mishawaka. He also kept ownership of his business, CATV, and the business assets. James and Heidi divided the personal property and the 1999 state and federal

---

Support Given by Debtor to Heidi Wiseman." R. 1. The court has construed the document to be a complaint under 11 U.S.C. § 523(a)(15).

**2.** The underlying facts in this case were taken from the parties' Findings of Fact, R. 46 and 47, from the testimony of witnesses, and the evidence presented at trial. All exhibits were admitted in evidence by stipulation.

income tax refunds. Each got a 401(k) plan from CATV, as well. Heidi received approximately $182,000 ($97,348 from the sale of the Dowagiac, Michigan lake property, $28,652 from James, and $56,000 from the refinancing of the Florida property). She also received a promissory note in the amount of $56,000, payable within 7 years. Heidi assumed responsibility for her individual debts from the time of their separation. James was responsible for the business debts, mortgages, a Visa card debt of $11,000, the educational expenses for their youngest daughter (a senior at Purdue University), and his individual debts from the time of their separation.

Executed simultaneously with the Settlement Agreement on June 21, 2000, was an Employment Contract ("Contract") between Midwest CATV Engineering, Inc. and Heidi. *See* Pl.Ex. 3. At the time of signing, James wrote by hand into the Contract that he too was a party to the Contract. His handwritten interlineation appeared on the first line of the Contract, as shown in italics below:

> This Agreement made on June 21, 2000, between Midwest CATV Engineering, Inc. *and Jim Wiseman, individually,* ... and Heidi Wiseman....

Pl.Ex. 3. The Contract provided that Heidi would receive an annual salary of $30,000 from CATV for 19 years, payable bi-weekly starting July 1, 2000, and that she would receive a 401(k) contribution ($900 a year), health insurance payments (up to $141 per month), and life insurance on James's life. The Contract was signed twice by James, once as President of CATV and once as "Jim Wiseman—individually," and by Heidi.

The Contract stated that Heidi was employed as a sales representative and would work from home for 19 years. However, at trial Heidi testified that she never worked under that Contract, and both James and Heidi testified that it was never the intention of either party that she would work for the company. *See* R. 46 at ¶ 11. Heidi and her divorce attorney, Dennis Brennan, stated at the trial that the purpose of the Contract was to even out the distribution of the marital assets and to construct the disbursement in a manner that would secure a favorable tax treatment. *See id.* at ¶ 8. Heidi testified that the division of marital property was reflected in both documents, the Settlement Agreement and the Contract, together. The Settlement Agreement was unfair without the Contract, she added. However, James testified that he did not want to sign the Contract individually but that the emotions of the day led him to write himself into the Contract. He also said that he had agreed to the Contract only because he and Heidi could not resolve the valuation of CATV and he did not want to sell the business.

After the divorce, Heidi moved into a villa and James stayed in the family home. Heidi's villa cost $135,000; it is a 2–bedroom, 2–bath home with 1,100 square feet of living space, a finished basement and attached garage. James's Mishawaka home is a 6,000 square-foot house on 3 acres of land. It has a hot tub, outdoor and indoor pools, a tennis court, and an indoor basketball court. Because the real estate taxes on it are $8,200 a year and the maintenance costs are high, it has been expensive for him to live there. Although James tried to sell his residence for 9 or 10 months in 2005, he was unable to sell it because it is an "odd parcel" without a river view, according to MarkNoeldner, manager of the commercial lending department of Teachers Credit Union ("TCU"). Mr. Noeldner also testified that James installed the inground pool with a deck around it in the summer of 2003, after CATV had failed as a business and after

James had ceased the annual payments to Heidi under the Contract. James admitted that he added the pool in the back yard for his sons by his second marriage; he used insurance money to put it in, he testified. He added that his second marriage did not last; as a result of that divorce, James pays $850 each month for support of the three children from that marriage.

James also received the commercial property in Mishawaka as part of the property settlement. Mr. Noeldner testified that TCU holds the mortgage on that property and that the payments are current. James runs his business from that property and rents the rest of it. He earns a profit on the property of about $4,000 a year. Moreover, the equity in the business has increased as the tenants continue to pay rent, Mr. Noeldner stated. Nevertheless, James said that he assumed more than $800,000 of debt from CATV and now he pays over $60,000 each year in interest; moreover, the loan balances on the two Mishawaka properties exceed the property values by more than $100,000. *See* R. 47 at ¶ 24. According to both James and Mr. Noeldner, James has kept current on the mortgage payments of both properties.

James's business, CATV, began to run into difficulties in the late 1990s. It had been successful repairing cellular and analog equipment and first generation cellular phones, and it was putting telecom installations in schools for the new technology. However, changes in the marketplace affected his business: Cellular companies kept changing their equipment, and their warranties began to include buying back the equipment so that it did not need to be repaired. Expensive litigation with unions also led to the demise of his business. James finally agreed to cease CATV operations if the unions would stop the lawsuits. The business closed in the summer

of 2002. James auctioned off the business assets of CATV, when the business collapsed, and got only $19,000 from the proceeds.

As the business was unraveling, James also stopped the payments that CATV had been making to Heidi under the Contract for two years. On April 30, 2002, James wrote Heidi a letter stating that he was closing CATV and that he would no longer make her bi-weekly payments or contribute to the 401(k) plan, medical insurance, or life insurance under the Contract. *See* Def. Ex. 8. He in fact made no payments after April 30, 2002. At the trial, James testified that he did not then, and does not now, have the ability to pay the bi-weekly obligation to Heidi.

Mark Noeldner, who manages James's TCU accounts, testified that James had owed about $1,050,000 in obligations after the demise of CATV, and now he owes about $510,000. He has cut his obligations to TCU in half, in part by refinancing the mortgage on his Mishawaka home and in part by selling the Florida property and using the $103,000 in net profit to pay down the TCU debt. Just when CATV ceased business operations, James started up the new business named Broadband Digital Repair, Inc., and it repairs only cable TV equipment. TCU has continued its lending relationship with the new business. Even when his business was declining, James was never even 30 days delinquent in his payments, said Mr. Noeldner. James kept up his payments, refinanced the mortgage, and did all that TCU could ask of him in meeting his obligations. However, because James's present business Broadband has a negative worth and James's assets are worth $133,000 less than what's owed, Mr. Noeldner opined that it would not qualify for additional lending and it could not afford to pay $30,000 a year for a new employee or for

an individual debt to Heidi. He also stated that James could not personally afford to pay $30,000 a year and would not qualify for a loan. He stated that James reaffirmed his debt to TCU. He also testified that TCU has made other loans to James since he filed bankruptcy, in $10,000–15,000 increments, up to $50,000.

At the time of the divorce, Heidi was 47; she had a high school degree and had worked as a stay-at-home mother during their marriage. After the divorce, she worked part-time in a library. When the bi-weekly payments from CATV stopped in 2002, she began working full-time as a librarian in the Mishawaka–Penn–Harris-Madison Public Library, now earning approximately $18,000 a year. In order to support herself and meet her expenses, she depleted her 401(k) account ($20,000) and her savings account ($10,000). In addition, she took out a $30,000 home equity loan on her villa, and it currently has a balance of about $23,000. R. 46 ¶ 28. Her current expenses exceed her current income by $10,000 per year. *Id.* at ¶ 29; R. 47 at ¶ 23. In addition, she testified that she has suffered heart problems recently. *See* R. 47 at ¶ 23. She expressed her worries about future health complications, meeting her present obligations, and saving for retirement. She claims that James's failure to pay under the Contract has created a true hardship for her.

In 2003, one year after stating that he would no longer make payments to Heidi, James estimated that his monthly income was $14,025 a month. *See* R. 46 at ¶ 16. In that year he installed an outdoor in-ground swimming pool at his home. *Id.* at ¶ 19. In 2005, his monthly income dropped to $6,765 a month. *See id.* at ¶ 16. He has continued to reside in his home, in spite of the fact that the taxes and upkeep are high. He attempted to sell the home in 2005, three years after stopping the payments to Heidi and after filing bankruptcy, but eventually took it off the market without success.

James testified that he cannot pay Heidi personally. He stated that he has had a second divorce and must pay child support costs and $60,000 in interest payments each year. Even though he has managed to keep his mortgage payments current on both his residence and commercial property in Mishawaka, he has no health insurance and is behind on property and payroll taxes. He has only two employees working for Broadband, and he must do all the paperwork, pick up and carry the equipment, and sometimes do the repairs himself. Heidi agreed that James complied with all his obligations under the Settlement Agreement. However, he insists that he cannot keep up his payments to her under the Contract because CATV did not stay in business. James admitted that paragraph 4(a) of the Settlement Agreement states that he must pay all the debts of CATV. However, he did not agree that one of those debts was the Contract obligation to pay Heidi $30,000 a year. He testified that he has furniture only in his bedroom, but none in his living room, dining room, or kitchen. He listed the home with ReMax for $495,000, and dropped the price to $430,000, but still it did not sell. James claimed that he must sell the house at a value that is acceptable to TCU, because he owes $285,000 on it. He was frustrated that, after he being in business all these years, he still could not pay off his debts. He insisted that he could not pay Heidi, as well.

*Discussion*

The plaintiff asks the court to determine that the debtor's property settlement obligation to his former spouse, ordered in the Property Settlement Agreement and Employment Contract, is excepted from his discharge under § 523(a)(15), which pro-

hibits the dischargeability of "any marital debt other than alimony, maintenance or support that is incurred in connection with a divorce or separation." *In re Crosswhite*, 148 F.3d 879, 883 (7th Cir.1998). Section 523(a)(15) states that an individual debtor is not discharged from any debt:

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless—

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor.

■■■ The plaintiff has the initial burden of proving that she holds a subsection (15) claim against the debtor, and then the burden shifts to the debtor defendant to prove that he falls within either of the two exceptions found in § 523(a)(15)(A) or (B). *See Crosswhite*, 148 F.3d at 884. "[T]he party claiming an exception to discharge usually bears the burden of proving by a preponderance of the evidence that the debt is not dischargeable." *Id.* at 881 (citing *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

In this case, Heidi claims that the debt James owes to her under the Contract is an obligation "incurred by the debtor in the course of a divorce or separation agreement" that is presumptively nondischargeable under § 523(a)(15). James insists that the Contract debt was not included in the provisions of the Settlement Agreement and therefore was dischargeable. Moreover, he argues that the Agreement expressly states that it alone provides for the disposition and settlement of all property and maintenance rights between the defendant and the plaintiff.

■■■ In Indiana, divorcing parties are free to divide their property and to draft their own settlement agreement. *See Myers v. Myers*, 560 N.E.2d 39, 44 (Ind. 1990); *White v. White*, 819 N.E.2d 68, 70 (Ind.App.2004) (citations omitted). A court applies general rules of construction of contracts in interpreting settlement agreements: When the agreement's terms are clear and unambiguous, they are conclusive; only when the terms are ambiguous does a court look to extrinsic evidence and construe the contract. "The terms of a contract are not ambiguous merely because the parties disagree as to the proper interpretation of the terms." *White*, 819 N.E.2d at 70.

Where the intentions of the parties can be clearly ascertained by the language employed in a contract, courts will recognize and enforce that agreement. The same principle will be applied regarding settlement agreements by parties to a dissolution action where the agreement clearly indicates the parties intended to have the provision applied to and be considered property.

*Myers*, 560 N.E.2d at 44. In addition, whether an employment contract between a debtor (in his business and personal capacity) and his former spouse represents a nondischargeable debt depends on the intent of the parties when they entered

into the settlement agreement settling their divorce litigation. *See Middel v. Jake's on the Pike (In re Jake's on the Pike)*, 78 B.R. 461, 463 (Bankr.E.D.Va. 1987).

■ The court begins with the contracts themselves. The parties executed the Property Settlement Agreement; it was approved by the state court and was incorporated and merged into the Decree of Dissolution. The Employment Contract executed on the same day by the same parties was not incorporated and merged into the Decree of Dissolution or into the Property Settlement Agreement. It is James's position that the Contract was a claim Heidi had against James that was released under paragraph 6 of the Settlement Agreement.[3] It is Heidi's view that the Contract was not released because it was created pursuant to the terms of the Settlement Agreement and was one of the debts of CATV for which James was held responsible under paragraph 4.[4] The court finds that the Employment Contract between CATV and Heidi, promising compensation and benefits from the time of the divorce decree and signed by James as President and individually, was signed on the same day that the Decree and Settlement Agreement were signed and was signed by the same parties. Under the terms of the Settlement Agreement, the court determines, it clearly and unambiguously is a debt of CATV for which James has agreed to assume responsibility under paragraph 4 of the Settlement Agreement. It is excepted from paragraph 6 because it is one of the "claims and rights of [Heidi] created and outstanding against [James] pursuant to the terms of this Agreement."

The court also finds that the parties clearly intended the debt to be a business obligation incorporated into the Settlement Agreement. At trial, both Heidi and her divorce attorney, Dennis Brennan, testified that the Contract was an essential part of the division of property from the marital estate; they insisted that the Settlement Agreement would not have been acceptable without that Contract. The Contract, which was created after James's lawyer presented a valuation of the marital assets, equalized the division of assets, provided tax benefits to the parties and health insurance for Heidi. The Contract made the Settlement Agreement fair; it was part and parcel of the divorce decree and property settlement. In addition, because the parties could not agree on the value of CATV, the Contract became the means for avoiding the sale of the business. In the view of the court, both parties benefitted from the Contract's structured payment.

Courts routinely recognize that payments, either in lump sum or periodic, are used to equalize property division between divorcing spouses. *See, e.g., In re Crosswhite*, 148 F.3d at 881; *Brown v. Pitzer (In re Brown)*, 249 B.R. 303, 305 (S.D.Ind. 2000); *Strayer v. Strayer (In re Strayer)*,

---

3. Paragraph 6 of the Settlement Agreement states:

In consideration of all of the promises contained in this Agreement, Husband and Wife hereby release all claims and rights which either has had, now has or might hereafter have against the other by reason of their former relationship as Husband and Wife, or otherwise, excepting all of the claims and rights of each party, created and outstanding against the other pursuant to the terms of this Agreement.

Pl.Ex. 2, ¶ 6.

4. Paragraph 4 of the Settlement Agreement states, in pertinent part:

Husband agrees to assume responsibility for and pay the following marital debts: (a) All debts of Midwest CATV Engineering, Inc.

. . .

Pl.Ex. 2, ¶ 4.

228 B.R. 211, 212 (Bankr.S.D.Ind.1996). This court determined, in open court, that the Employment Contract was meant to balance out the parties' division of assets. It also recognized that the parties intended to equalize the marital assets through the provisions in the Contract. Under the Settlement Agreement, James was given virtually all the marital property and debt. *See* Pl.Ex. 2. However, James's divorce lawyer calculated that the total marital assets were valued at $1,160,772, and therefore a fair division of that property was "$580,386.00 to each party." Pl.Ex. 1. Heidi received only about $182,000 in marital property under the Settlement Agreement. Her receipt of $30,000 annually for 19 years was intended to provide her with bi-weekly income until her retirement, and those payments totaled $570,000 over 19 years.

After considering the clear language of the Settlement Agreement, the intent of the parties that each spouse receive about $580,386, the costs and benefits of making incremental payments over a long span of years, and the risk (clearly a real one) that the payments might not continue, the court finds that the Contract payments to Heidi were meant to equalize the property settlement distribution of marital assets. *See In re Jake's on the Pike*, 78 B.R. at 464–68 (considering whether the parties mutually intended the settlement agreement and employment contract to represent a debt for alimony or property settlement). The court finds, as well, that the plaintiff met her burden of establishing that the obligations under the Contract were intended by the parties to be part of the Settlement Agreement and to be paid pursuant to paragraph 4(a) of the Settlement Agreement. Consequently, it determines that the Contract debt was "incurred by the debtor in the course of a divorce ... or in connection with a separation agreement [and] divorce decree," as § 523(a)(15) provides.

■ Having found that the plaintiff met her initial burden of proving that the debt in question arose in connection with their divorce and was not an § 523(a)(5) debt, the court now considers the debtor's task of proving that the debt fell within either of the two exceptions listed under § 523(a)(15). The debtor was required to demonstrate, under (A), that he cannot pay the debt out of his disposable income, or, under (B), that the benefit to him of discharging the debt is greater than the detrimental effect on his former spouse of discharging the debt. *See Crosswhite*, 148 F.3d at 883. The two subsections are alternatives. Thus, "a debtor 'must meet the burden on only one of the two prongs of Section 523(a)(15) to prevent the debt from being excepted from discharge.' " *Turner v. McClain (In re McClain)*, 227 B.R. 881, 885 (Bankr.S.D.Ind.1998) (quoting *In re Florez*, 191 B.R. 112, 115 (Bankr. N.D.Ill.1995)).

■ The court first considers whether James met his burden under § 523(a)(15)(A) by proving that he cannot pay the debt out of his disposable income. When determining a debtor's ability to pay, a court applies a disposable income test. "[O]nce the court has taken into account a debtor's 'reasonably necessary' personal and business expenses, the court must determine if the debtor has enough assets or income sufficient to pay the obligations at issue." *Beggs v. Niewdach (In re Beggs)*, 314 B.R. 401, 417 (Bankr. E.D.Ark.2004) (citations omitted). "In doing so, the court should consider the debtor's entire economic circumstances," including his future circumstances and earning potential. *Id.*

At trial and in his post-trial brief, James asserted that CATV provided an outstanding level of income and lifestyle; however,

after CATV's demise, James has struggled to keep payments current on the $850,000 debt. Both James and his TCU loan officer testified that he does not have the ability to pay a $30,000 per year salary to Heidi.

Heidi responded that James has continued to maintain and support a home with an indoor swimming pool, indoor basketball court, tennis courts, and real estate taxes in excess of $8,000 per year. A year after suspending the payments to Heidi, James installed an outdoor inground pool. Heidi claimed that those items are not reasonably necessary for the maintenance or support of the debtor. In addition, she noted that he has positive cash flow from his commercial leases and is building equity in the property. James's estimate of his monthly income for 2005 was nearly 5 times Heidi's income, she pointed out. Finally, she argued that James chose to reaffirm the TCU debt and has reduced it from $1 million to $500,000 during the time he terminated payments to her.

There is no doubt that the technology repair industry is required to be adaptable in order to survive. CATV was created at the beginning of a new technology, but the speedy changes in the marketplace led to its demise. Nevertheless, out of its ashes rose James's new business, Broadband, which repairs cable television equipment. It appears to be a smaller but still successful business. James's income from Broadband and from the rentals of his commercial building, along with the mortgage refinancing and sale of the Florida real estate, have allowed the defendant to pay down half of his debt—over $500,000—to his major creditor TCU in a few years. It appears that his income has increased, from the time of filing bankruptcy to the date of the trial, and he may be able

to pay his debt to Heidi in installments from future income. *See Taylor v. Taylor,* 199 B.R. 37, 40 (N.D.Ill.1996) (finding that debtor can pay debt from future income, therefore does not lack ability to pay).

In addition, the court finds that James continues to live in a luxurious home and to pay an expensive mortgage, taxes and bills, while insisting that he cannot pay his divorce obligations. He testified that he attempted to sell his house for $495,000, but he took it off the market when it did not sell for $430,000. He also testified that he owes $285,000 to TCU for the home. There is no evidence, however, that his continuing to live there is reasonable or necessary, or that he considered such alternatives as selling the house at a lower amount or renting it and living in more modest accommodations. *See In re Beggs,* 314 B.R. at 419–20 (requiring debtor to prove that expenses are reasonable and necessary).

In addition, the defendant reported on his bankruptcy schedules that he pays, every month, $4,900 for mortgage payments, $1,000 for property insurance, $100 for homeowner's insurance, and $250 for home maintenance. His personal monthly expenses are also extravagant: $900 a month for food, $500 for clothing, $500 for health insurance,[5] and $495 for automobile payments. James presented no evidence to show that these expenses are reasonable and necessary. *See id.* The court finds that James's living expenses are not modest or reasonable. It believes that he has the ability to pay his property settlement debt from his lavish property or from his extravagant expenses that are not reasonably necessary to be expended for his maintenance or support.

---

**5.** When explaining why he is unable to pay his obligation to Heidi, James testified that he has no health insurance and is behind on property and payroll taxes.

The court finds that the defendant has not sustained his burden of proof under § 523(a)(15)(A). He has not demonstrated that he is unable to pay the debt to Heidi either from future income or from income not reasonably necessary for the support of himself or his business.

The court next considers whether the property settlement debt is dischargeable under § 523(a)(15)(B). The debtor bears the burden of proving that the benefit to him of receiving a discharge of the debt outweighs the detriment to the plaintiff. *See McClain,* 227 B.R. at 885. In weighing the benefit versus the detriment, "the Court should examine the 'totality of the circumstances.'" *Id.* (quoting *Crosswhite,* 148 F.3d at 883). However, James based his argument entirely on his inability to pay under § 523(a)(15)(A), not (B):

> [E]ven if the obligation to Heidi under the Employment Contract was a debt of the type described in 11 U.S.C. § 523(a)(15), James has satisfied his burden of proof under § 523(a)(15)(A) that he does not have the ability to pay the obligation.

R. 47 at ¶ 43. The debtor defendant must plead the affirmative defense of § 523(a)(15)(B) or he waives it. *See Morris v. Morris (In re Morris),* 197 B.R. 236, 243 (Bankr.N.D.W.V.1996); *Gantz v. Gantz (In re Gantz),* 192 B.R. 932, 936 (Bankr.N.D.Ill.1996). The court finds that the defendant has waived his right to his subsection (B) defense and thus has not met his burden of proof under that provision.

### Conclusion

For the reasons presented above, the Petition for Objection to Discharge of Claim of Marital Support Given by Debtor To Heidi Wiseman, which the court construes as a Complaint in this adversary proceeding, is granted. The obligations owed to the plaintiff Heidi Wiseman by the defendant James A. Wiseman pursuant to 11 U.S.C. § 523(a)(15) are excepted from the defendant's discharge in his chapter 7 bankruptcy.

SO ORDERED.